[Cite as *State v. Bradley*, 2026-Ohio-232.]

COURT OF APPEALS
LICKING COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | |
|---|---|
| STATE OF OHIO | Case No. 2025 CA 00038 |
| Plaintiff - Appellee | <u>Opinion And Judgment Entry</u> |
| -vs- | Appeal from the Court of Common Pleas, Case No. 2024 CR 00791 |
| MARCUS BRADLEY | Judgment: Affirmed/Reversed in Part |
| Defendant – Appellant | Date of Judgment Entry: January 27, 2026 |

**BEFORE:** William B. Hoffman; Andrew J. King; David M. Gormley, Appellate Judges

**APPEARANCES:** KENNETH W. OSWALT, for Plaintiff-Appellee; JOSEPH C. PATITUCE, for Defendant-Appellant.

*King, J.*

{¶ 1}   Defendant-Appellant, Marcus Bradley, appeals his May 6, 2025 sentence from the Licking County Court of Common Pleas.  Plaintiff-Appellee is the State of Ohio.  We affirm/reverse in part the trial court.

FACTS AND PROCEDURAL HISTORY

{¶ 2}   On November 14, 2024, the Licking County Grand Jury indicted Bradley on two counts of menacing by stalking in violation of R.C. 2903.211(A)(1) and (2), a felony of the fourth degree and a misdemeanor of the first degree, respectively, one count of dissemination of image of another person in violation of R.C. 2917.211(B), a misdemeanor of the third degree, two counts of burglary in violation of R.C. 2911.12(A)(2) and (3), felonies of the second and third degree, respectively, and one count of theft in

violation of R.C. 2913.02(A)(1), a felony of the fifth degree. The charges arose from incidents involving Bradley and the victim, his ex-girlfriend. Bradley and the victim broke up in July 2024. In August 2024, the victim started a relationship with a new boyfriend. Between July and September 2024, Bradley harassed the victim and the new boyfriend through text, verbal, and direct messaging, sent nude photographs of the victim to the new boyfriend, and broke into the victim's home and stole gifts he had given her.

{¶ 3} On May 6, 2025, Bradley pled guilty to all the charges except for one of the burglary counts [R.C. 2911.12(A)(2)] which was dismissed. By judgment entry filed on the same date, the trial court sentenced Bradley to five years of community control with six months in jail.

{¶ 4} Bradley filed an appeal with the following assignments of error:

I

{¶ 5} "THE TRIAL COURT ERRED TO APPELLANT'S PREJUDICE WHEN IT FAILED TO MERGE COUNTS AS ALLIED OFFENSES OF SIMILAR IMPORT."

II

{¶ 6} "THE TRIAL COURT ERRED TO APPELLANT'S PREJUDICE WHEN IT SENTENCED HIM TO COMMUNITY CONTROL SANCTIONS NOT REASONABLY RELATED TO THE OFFENSES ON WHICH APPELLANT WAS CONVICTED."

I

{¶ 7} In his first assignment of error, Bradley claims the trial court erred in failing to merge counts as allied offenses of similar import. We disagree.

{¶ 8} Bradley was convicted of two counts of menacing by stalking, one count of dissemination of image of another person, one count of burglary, and one count of theft.

Bradley argues "the record is mostly devoid of specific facts that evidence that Mr. Bradley's conduct here had a separate animus."  Appellant's Brief at 3.  Therefore, Bradley argues all of the offenses constitute allied offenses of similar import; "however, in full transparency, there is a fair argument to be made" that the menacing and dissemination counts merge and the burglary and theft counts merge.  *Id.* at 4.  Bradley argues the "theft is the underlying criminal action contained in the burglary count and was done for the same animus - to harass the victim."  *Id.* at 5.

{¶ 9}  Bradley did not object to his sentence at the time of sentencing.  In fact, the prosecutor stated: "We would also ask that the Court find that there is no merger between any of the counts, that they were committed with separate animus, and separate acts over the course of several months."  May 6, 2025 T. at 18.  Bradley did not contest this statement.  When asked if he had anything to add before sentence was imposed, Bradley remained silent on the issue of merged sentences.  *Id.* at 22.  As held by the Supreme Court of Ohio in *State v. Rogers,* 2015-Ohio-2459, ¶ 3:

An accused's failure to raise the issue of allied offenses of similar import in the trial court forfeits all but plain error, and a forfeited error is not reversible error unless it affected the outcome of the proceeding and reversal is necessary to correct a manifest miscarriage of justice. Accordingly, an accused has the burden to demonstrate a reasonable probability that the convictions are for allied offenses of similar import committed with the same conduct and without a separate animus; absent that showing, the accused cannot demonstrate that the trial court's failure

to inquire whether the convictions merge for purposes of sentencing was plain error.

{¶ 10} In order to prevail under a plain error analysis, appellant bears the burden of demonstrating that the outcome of the trial clearly would have been different but for the error. *State v. Long,* 53 Ohio St.2d 91 (1978); Crim.R. 52(B). Notice of plain error "is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *Long* at paragraph three of the syllabus.

{¶ 11} R.C. 2941.25 governs multiple counts and protects a defendant's rights under the Double Jeopardy Clauses of the United States and Ohio Constitutions by prohibiting convictions of allied offenses of similar import:

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶ 12} As held by the Supreme Court of Ohio in *State v. Ruff,* 2015-Ohio-995, ¶ 25:

A trial court and the reviewing court on appeal when considering whether there are allied offenses that merge into a single conviction under R.C. 2941.25(A) must first take into account the conduct of the defendant. In other words, how were the offenses committed? If any of the following is true, the offenses cannot merge and the defendant may be convicted and sentenced for multiple offenses: (1) the offenses are dissimilar in import or significance—in other words, each offense caused separate, identifiable harm, (2) the offenses were committed separately, or (3) the offenses were committed with separate animus or motivation.

{¶ 13} "An affirmative answer to any of the above will permit separate convictions. The conduct, the animus, and the import must all be considered." *Id.* at ¶ 31.

{¶ 14} We note this court has found the offenses of burglary and theft to be allied offenses of similar import. *State v. Ramunas*, 2021-Ohio-3191 (5th Dist.). In *Ramunas,* the defendant was an employee of an assisted-living facility where she stole credit cards, jewelry, and personal items from six elderly residents over a two-month period of time. She pled guilty to several counts of burglary and theft. The trial court did not merge the offenses, finding each offense had a separate purpose and resulted in a separate harm. This court reversed, finding the counts should have merged because "the burglary and theft charges stem from Ramunas's conduct of entering the resident's room with the

purpose to steal items therein. Ramunas committed both offenses through a single course of conduct and with a single state of mind." *Id.* at ¶ 20. This court certified the judgment to the Supreme Court as being in conflict with a judgment from the Fourth District which held burglary and theft offenses are not allied offenses of similar import subject to merger. *State v. Gillman*, 2015-Ohio-4421 (4th Dist.). The Court dismissed the certification as having been improvidently certified. *State v. Ramunas*, 2022-Ohio-4199. Three justices dissented in two dissenting opinions. In his dissenting opinion, Justice Fischer concluded "when the record contains evidence demonstrating that burglary and theft offenses caused separate and distinct harms to a victim, then for purposes of R.C. 2941.25, the offenses of burglary and theft are not allied offenses of similar import." *Id.* at ¶ 3. Justice Fischer reasoned the following at ¶ 24-27:

> In this matter, we should decide whether the harms that resulted from Ramunas's conduct in committing burglary and theft are separate and identifiable. I would conclude that the evidence demonstrates that Ramunas's conduct resulted in separate harms and, therefore, the offenses should not be merged.
>
> One harm suffered is the violation and loss of the victims' sense of trust and security in their personal living spaces at the assisted-living facility. This harm resulted from Ramunas's entering the victims' living spaces for the purpose of stealing. The victims would have suffered this harm even if Ramunas had not stolen any property; therefore, the harm caused by the burglaries is independent of and unrelated to the harm caused by the thefts.

A second harm inflicted on the victims resulted from the loss of their valuables, which was caused by Ramunas's stealing the victims' possessions. And this harm was twofold. The victims not only experienced economic harm by being deprived of the stolen items' monetary value, but they also suffered emotional harm, which was particularly acute because some of the items taken (e.g., one victim's wedding ring) had significant sentimental value.

The evidence in this matter reveals that the victims suffered separate and distinct harms as the result of Ramunas's burglary and theft offenses. Therefore, under these particular facts, the offenses of burglary and theft are of dissimilar import and should not be merged.

{¶ 15} In a separate dissent, Justice DeWine and Justice Kennedy concluded the Court should have resolved the issue of allied offenses. *Id.* at ¶ 30. Justice DeWine, without Justice Kennedy, went a step further and conducted an analysis of R.C. 2941.25 pre- and post-*Ruff* and concluded *Ruff* "was wrongly decided and has proved to be unworkable, [so] we should return to the language of the statute and our pre-*Ruff* caselaw." *Id.* at ¶ 40. Justice DeWine explained he would compare the two offenses in the abstract to determine their import and apply the test advanced in *Blockburger v. United States*, 284 U.S. 299, 304 (1932) ("where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not"). Justice DeWine posited in reviewing the two offenses,

burglary and theft, it is apparent they are not the same because both "require proof of multiple elements that the other does not" and "neither offense is implicit in the commission of the other." *Ramunas* at ¶ 56. He reasoned, "[a] person who breaks into a house with the intent to steal something but finds nothing worth taking commits a burglary but not a theft. And a person who enters with permission commits only a theft when that person makes off with the resident's possessions." *Id.*

{¶ 16} Unfortunately, the Court decided to pass on reviewing the issue; perhaps it will have a chance to revisit the issue in a future case. But because the Supreme Court has yet to issue a majority opinion on this conflict of allied offenses, the unworkability of *Ruff* is beyond the scope of this opinion, and we will adhere to the case law as set forth in *Ruff*.

{¶ 17} We distinguish this court's opinion in *Ramunas* from the case here based on the facts.

{¶ 18} Bradley pled guilty to one count of burglary in violation of R.C. 2911.12(A)(3) which states: "No person, by force, stealth, or deception, shall . . . [t]respass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, with purpose to commit in the structure or separately secured or separately occupied portion of the structure any criminal offense." He also pled guilty to one count of theft in violation of R.C. 2913.02 which states: "No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services . . . [w]ithout the consent of the owner or person authorized to give consent."

{¶ 19} As to these charges, the prosecutor presented the facts. The prosecutor explained in August 2024, the victim returned home and noticed her back door deadbolt was unlocked, all the gifts Bradley had given her were missing, and the flushing mechanism on her toilet was broken. May 6, 2025 T. at 10. The victim and her boyfriend called Bradley and recorded the telephone call. *Id.* at 11. Bradley stated, "a person could get into her house through a particular window" and admitted to entering her house multiple times, leaving the deadbolt unlocked so she would know someone had been in the house. *Id.* He laughed "at how expensive the toilet running is to her water account and that he took her property." *Id.* He admitted to entering her home and stealing her property "because she wasted a year of his life and he wanted her to love him the way she loved her new boyfriend." *Id.* Photographs of the stolen property were admitted as State's Exhibit 1. The victim was "very very scared for her safety and the safety for her child" after the break-ins. *Id.* at 18-19.

{¶ 20} Bradley did not contest any of the prosecutor's statements and agreed with the facts as presented. *Id.* at 11.

{¶ 21} We find there are ample facts to support two separate counts, one for burglary and one for theft. Bradley entered the victim's locked home on numerous occasions, leaving the deadbolt unlocked for no other reason than to threaten and scare her, and on one occasion, stole her property. The offenses were not a continuing course of conduct or committed with a single state of mind because he committed the offense of burglary several times, entering the victim's home to harass and threaten her without stealing anything, until he did. The offenses were committed with a separate animus or motivation and the victim experienced distinct harms – fear of someone entering the

sanctity of her home and the economic loss of her property. We do not find allied offenses here.

{¶ 22} Bradley also pled guilty to two counts of menacing by stalking in violation of R.C. 2903.211(A)(1) and (2) which state:

(A)(1) No person by engaging in a pattern of conduct shall knowingly cause another person to believe that the offender will cause physical harm to the other person or a family or household member of the other person or cause mental distress to the other person or a family or household member of the other person. In addition to any other basis for the other person's belief that the offender will cause physical harm to the other person or the other person's family or household member or mental distress to the other person or the other person's family or household member, the other person's belief or mental distress may be based on words or conduct of the offender that are directed at or identify a corporation, association, or other organization that employs the other person or to which the other person belongs.

(2) No person, through the use of any form of written communication or any electronic method of remotely transferring information, including, but not limited to, any computer, computer network, computer program, computer system, or telecommunication device shall post a message or use any intentionally written or verbal graphic gesture with purpose to do either of the following:

(a) Violate division (A)(1) of this section;

(b) Urge or incite another to commit a violation of division (A)(1) of this section.

{¶ 23} The R.C. 2903.211(A)(1) count was indicted as a felony of the fourth degree. Under subsection (B)(2), menacing by stalking is a felony of the fourth degree if:

(b) In committing the offense under division (A)(1), (2), or (3) of this section, the offender made a threat of physical harm to or against the victim, or as a result of an offense committed under division (A)(2) or (3) of this section, a third person induced by the offender's posted message made a threat of physical harm to or against the victim.

(c) In committing the offense under division (A)(1), (2), or (3) of this section, the offender trespassed on the land or premises where the victim lives, is employed, or attends school, or as a result of an offense committed under division (A)(2) or (3) of this section, a third person induced by the offender's posted message trespassed on the land or premises where the victim lives, is employed, or attends school.

{¶ 24} He also pled guilty to one count of dissemination of image of another person in violation of R.C. 2917.211(B) which states:

(B) No person shall knowingly disseminate an image of another person if all of the following apply:

(1) The person in the image is eighteen years of age or older.

(2) The person in the image can be identified from the image itself or from information displayed in connection with the image and the offender supplied the identifying information.

(3) The person in the image is in a state of nudity or is engaged in a sexual act.

(4) The image is disseminated without consent from the person in the image.

(5) The image is disseminated with intent to harm the person in the image.

{¶ 25} Again, the prosecutor presented the facts. The victim reported Bradley started harassing her after they broke up in July 2024 and she started dating a new boyfriend in August 2024. May 6, 2025 T. at 9. Bradley harassed both the victim and the boyfriend for months, from July 2024 to September 2024. *Id.* at 9, 18; Indictment filed November 14, 2024. He sent the boyfriend nude photographs of the victim and a video the victim had sent Bradley while they were dating. May 6, 2025 T. at 9. Bradley threatened to sell the photographs/video and/or post them online. *Id.* When the victim told Bradley to leave her alone, he told her, "'You thought I was crazy when we dated; you haven't seen anything yet.'" *Id.* at 10. Bradley messaged the victim from different phone numbers, one time informing her he had a sexually transmitted disease and, in

another message, posing as a detective who needed to speak to her. *Id.* These communications caused the victim significant stress and strain. *Id.* at 18.

{¶ 26} Bradley agreed with the facts as presented. *Id.* at 11.

{¶ 27} We find there are ample facts to support two separate counts of menacing by stalking and one count of dissemination of image of another person. On numerous occasions, through verbal and written communications and electronic methods to both the victim and her boyfriend, Bradley engaged in a pattern of conduct that he knew would cause the victim, at a minimum, mental distress, if not fear of physical harm to herself or a loved one. He trespassed into the victim's home on numerous occasions, leaving the deadbolt unlocked to instill fear, and threatened the victim with "'you haven't seen anything yet.'" These actions were separate and apart from sending the nude photographs and the video to the victim's boyfriend. Bradley's menacing offenses were the same or of similar kind but were committed separately i.e., verbal/written/electronic communications and trespasses into her home. We do not find allied offenses here.

{¶ 28} Upon review, we find all the offenses were committed separately with separate, identifiable harms and with a separate animus or motivation as to each offense; the record does not reflect plain error. R.C. 2941.25 does not apply in this case.

{¶ 29} Assignment of Error I is denied.

II

{¶ 30} In his second assignment of error, Bradley claims the trial court erred in sentencing him to community control sanctions not reasonably related to the offenses on which he was convicted. We agree in part.

{¶ 31} Again, we note Bradley did not object to his sentence at the time of sentencing; therefore, we review his arguments under a plain error standard. *See State v. Bright*, 2025-Ohio-725, ¶ 7 (5th Dist.); *Long,* 53 Ohio St.2d 91; Crim.R. 52(B).

{¶ 32} R.C. 2929.15 governs community control sanctions. Under subsection (A)(1), trial courts "may impose any other conditions of release under a community control sanction that the court considers appropriate." Thus, trial courts have been granted broad discretion in imposing community control sanctions. *State v. Talty*, 2004-Ohio-4888, ¶ 10; *accord Bright* at ¶ 11. However, that discretion "is not limitless." *Talty* at ¶ 11, citing *State v. Jones,* 49 Ohio St.3d 51 (1990). In *Jones,* the Court determined in imposing a condition, trial courts "should consider whether the condition (1) is reasonably related to rehabilitating the offender, (2) has some relationship to the crime of which the offender was convicted, and (3) relates to conduct which is criminal or reasonably related to future criminality and serves the statutory ends of probation." *Jones* at 53; *accord Talty* at ¶ 12. A condition "cannot be overly broad so as to unnecessarily impinge upon the probationer's liberty." *Jones* at 52; *Talty* at ¶ 13. And "[t]he requirement that a condition may not be overbroad is connected to the reasonableness of a condition." *Talty* at ¶ 14.

{¶ 33} Here, Bradley challenges the following Nonresidential Community Control conditions from the trial court's May 6, 2025 judgment entry in part:

> 10. The defendant shall not consume, have in his/her possession, residence or automobile any type of alcoholic beverage or drugs of abuse.
>
> 11. The defendant shall not enter into any establishment that serves alcohol without the approval of the supervising officer.

12. The defendant shall attend as many AA and NA meetings per week as recommended by his/her counselor, and shall submit proof of his/her attendance to his/her probation officer. The defendant shall also secure a sponsor within 90 days.

{¶ 34} Bradley argues these conditions are not reasonably related to his criminal offenses, are not related to criminal conduct, and "are not reasonably related to prevent future criminality" as there were no allegations that he committed any of the offenses while under the influence of alcohol and/or drugs. Appellant's Brief at 6-7.

{¶ 35} During sentencing, the prosecutor never mentioned an alcohol or drug problem or that substance abuse was a part of Bradley's conduct. In fact, in arguing for a prison sentence, the prosecutor specifically stated, "[w]e don't believe that he has a drug or alcohol problem, but I submit that suggests that the Defendant's actions are even more concerning . . . because he's doing this all with sobriety." May 6, 2025 T. at 20.

{¶ 36} Bradley underwent a full drug/alcohol assessment on January 16, 2025, and was deemed "low risk." He scored 3 out of 40 on the Alcohol Use Disorders Identification Test and 0 on the Drug Abuse Screening Test. *See* Positive Pathways Counseling Report attached to the Presentence Investigation Report.

{¶ 37} This court is not in the habit of micromanaging a trial court's community control conditions. But here, we find the cited portions of condition Nos. 10 and 11 to be overly broad given the facts of this case. The prohibitions against alcohol/drug possession and use e.g., marijuana, and entering any establishment that serves alcohol without the approval of the supervising officer e.g., a restaurant, grocery store,

convenience store, have no relationship to the offenses of which Bradley was convicted and does not relate to conduct which is criminal or reasonably related to future criminality. We find the conditions are so overly broad as to unnecessarily impinge upon Bradley's liberty and are unreasonable. We find plain error in imposing these conditions.

{¶ 38} In condition No. 3, Bradley was ordered to "enter into and successfully complete an approved mental health treatment program" which is certainly related to the offenses in this case. Condition No. 12 is contingent on any recommendation of his counselor and if Bradley does not have an alcohol or drug problem, perhaps condition No. 12 does not come to pass. We do not find condition No. 12 to be overly broad in leaving any recommendation about attending substance abuse meetings in the hands of a medical professional.

{¶ 39} Bradley makes a passing argument to the imposition of a curfew and electronic monitoring. During sentencing, the trial court informed Bradley of the possibility of these conditions and he did not object. Bradley lives in Pennsylvania and drove several hours to get to the victim's home. May 6, 2025 T. at 20. Given Bradley's conduct, we find these conditions to be reasonably related to the offenses.

{¶ 40} Upon review, we hereby strike the cited portions of condition No. 10 and condition No. 11 under the Nonresidential Community Control sanctions.

{¶ 41} Assignment of Error II is granted in part.

{¶ 42} For the reasons stated in our accompanying Opinion, the judgment of the Licking County Court of Common Pleas is AFFIRMED in part and REVERSED in part.

{¶ 43} Costs to Appellant.

By: King, J.

Hoffman, P.J. concur and

Gormley, J. concurs separately.

*Gormley, J., concurring*

{¶ 44} I concur in the court's opinion today, though I feel compelled to write separately to point out key differences between the alcohol-related restrictions that we label as plainly erroneous in this case and some other similar but less sweeping restrictions that we have recently considered and left in place.

{¶ 45} In *State v. Kovach*, 2026-Ohio-171, ¶ 36 (5th Dist.), despite the lack of any connection between alcohol and a defendant's crime or his current rehabilitative needs, we concluded that a trial court did not commit plain error by imposing community-control conditions barring that defendant from using alcohol and barring him from entering liquor stores and bars. Likewise, in *State v. Bright*, 2025-Ohio-725, ¶ 18 (5th Dist.), we found no plain error in a trial court's decision to include no-alcohol and no-entry-into-bars conditions in a community-control sentence for a defendant whose crime was not linked to alcohol.

{¶ 46} Why is the outcome different today? For me, the difference lies in the broader scope of the alcohol-related restrictions at issue in this case.

{¶ 47} In both *Kovach* and *Bright*, the community-control conditions in question called for the defendants to abstain from alcohol (as well as illegal drugs) and to refrain from entering businesses where the sale of alcohol was the primary source of revenue. *Kovach* at ¶ 9; *Bright* at ¶ 5. Analyzing those restrictions solely for plain error, we did not overturn the trial courts' rulings even though nothing in those cases' records pointed to a link between alcohol use on the one hand and those defendants' current crimes or other past misconduct on the other.

{¶ 48} In today's case, the restrictions are more sweeping. The defendant was directed not only to abstain from alcohol but also to possess no alcohol in his home or vehicle. And he was barred from entering not only bars but also all other businesses that — according to his sentencing entry — "serve[] alcohol." That latter provision presumably means that he cannot dine at (or even pick up a take-out meal) at a great many fine-dining restaurants, pizza shops, and family-friendly restaurants. I assume, too, that any sports venues, wedding-reception sites, or concert halls where alcohol might be served would be off limits as well.

{¶ 49} For me, those expansive restrictions go too far in a case like this where alcohol is not alleged to have played any role in the defendant's wrongdoing and where no substance-use assessment points to a current alcohol-use concern. Complying with the trial court's broad alcohol-focused limits, were they to remain in place, would likely become a near-daily challenge — and perhaps also a frequent source of considerable frustration and resentment directed against our justice system — for a defendant whose rehabilitative efforts should presumably be focused elsewhere. For that reason, I join the court's opinion.

{¶ 50} In light of today's decision, I encourage trial judges to be cautious when considering whether to impose on probationers any no-alcohol-consumption requirements or any related limits on probationers' freedom to enter bars, restaurants, and other businesses where alcohol is sold or served.

{¶ 51} Certainly, in the appropriate case, those kinds of community-control conditions make perfect sense. *See, e.g., State v. Ice*, 2024-Ohio-5341, ¶ 14 (7th Dist.) ("a probation condition prohibiting a probationer's entry into premises where alcohol is

served would be reasonably related to rehabilitating an OVI defendant"); *State v. Weimer*, 2005-Ohio-2361, ¶ 48 (11th Dist.) (for a defendant who had "multiple DUI convictions," a trial court's "probation condition regarding alcohol was related to protecting the public by lessening the likelihood" that he would reoffend).

{¶ 52} Yet where alcohol has played no role in the crime or crimes in question, where no recent troubling events or substance-use assessments suggest a current alcohol-use problem, and where no information presented to the trial court in a presentence report or through trial testimony or in the parties' or a crime victim's statements points to a need for restrictions on a probationer's use of or access to alcohol, trial courts should be wary about including alcohol-related limits when spelling out community-control conditions at sentencing hearings. *See, e.g., State v. White*, 2015-Ohio-3844, ¶ 17 (10th Dist.) (striking a no-alcohol community-control condition that was "not related to criminal conduct" and where there was "no evidence" that the defendant "ha[d] an issue with drugs and alcohol, or will in the future"); *State v. Chavers*, 2005-Ohio-714, ¶ 12 (9th Dist.) (striking a no-alcohol condition where there was "nothing in the record to indicate that alcohol was involved in this crime" or in the defendant's "past convictions").

{¶ 53} And even where the facts of a particular case appear to justify those kinds of restrictions, trial courts, I believe, should think long and hard before barring a probationer from patronizing all business establishments where alcohol is sold. That kind of restriction — which presumably encompasses many restaurants, hotels, grocery stores, and convenience stores — imposes a heavy burden on the honest probationer who wants earnestly to comply with a trial court's orders and with the directions of a probation officer.

{¶ 54} Even the kind of restriction at issue here — which calls for defendant Bradley to stay out of "establishment[s]" that "serve" alcohol (as opposed to a presumably broader restriction barring him from entering businesses that *sell* alcohol, whether for on-premises or off-premises consumption) — would limit his ability to enter many restaurants and other venues. That kind of limit might be warranted for some probationers, but trial judges tempted to impose it should ask themselves whether such a restriction furthers the public-safety, rehabilitative, and reintegrative goals of community control in any given case.

{¶ 55} The seeming universality of alcohol-related restrictions in trial courts' community-control sentences has repeatedly pushed our court and others to wrestle with these issues. Well aware that we are not trial judges seeing and hearing what trial judges see and hear in their courtrooms, we are necessarily hesitant to second-guess trial judges' discretionary decisions about the most effective ways to supervise probationers and to protect the public, punish the guilty, change harmful behaviors, and promote effective rehabilitation.

{¶ 56} Yet some cases — even those like this one in which we focus solely on any plain error in the sentence — can move us to push back against a sentencing term that seems too far off the mark. Perhaps today's decision and other recent ones from our court in similar cases at least send the message that we are struggling to reconcile on the one hand our inclination to defer to the on-the-ground wisdom and experience of trial judges — who know their communities' needs and who must make difficult choices about the most effective ways to stretch limited community-control resources — and on the other hand the sense that perhaps some trial judges are routinely including alcohol-related

community-control restrictions without weighing whether those restrictions are necessary to promote the goals of felony and misdemeanor sentencing laws in any given case.

{¶ 57} Just as we have reflected on these issues and wrestled with them, I ask simply that trial judges likewise reflect on them in each case rather than reflexively including conditions in every community-control sentence that hindsight suggests are unneeded and perhaps even unhelpful in promoting the reintegrative and rehabilitative goals of community control.